**Wilfred KEYES, et al., Plaintiffs,**

**Congress of Hispanic Educators, et al., Plaintiff-Intervenors,**

v.

**SCHOOL DISTRICT NO. 1, DENVER, COLORADO, et al., Defendants.**

Civ. A. No. C–1499.

United States District Court, D. Colorado.

Dec. 30, 1983.

Peter D. Roos, Irma Herrera, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., Roger L. Rice, Camilo Perez-Bustillo, Cambridge, Mass., for plaintiff-intervenors.

Michael H. Jackson, Denver, Colo., John S. Pfeiffer, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER ON LANGUAGE ISSUES

MATSCH, District Judge.

The delay in dealing with the particular issues discussed in this memorandum opinion is a result of the difficulties involved in using the adversary process to assess the efforts made by a public school district to obey a mandate to replace a segregated dual school system with a unitary system in which race and ethnicity are not limitations on access to the educational benefits provided. Among those difficulties are: (1) the polarization of positions through pleadings and proof, (2) the necessity to make a retrospective inquiry into a very fluid problem focusing on a static set of operative facts, (3) the limitations in the Rules of Evidence, (4) the tension between minority objectives and majoritarian values in the political process, (5) the time constraints imposed by the volume of other litigation, and (6) the inertia inherent in the bureaucratic structure of public education. While the following discourse is directed toward the problems of children with language barriers, it must be recognized that the analysis is made in the context of a desegregation case which has been in this court for more than a decade.

Stated in the most comprehensive form, the plaintiff-intervenors' contention is that within the pupil population of the Denver Public Schools, those children who have limited-English language proficiency ("LEP") are being denied equal access to educational opportunity because the school system has failed to take appropriate action to address their special needs. Accordingly, it is claimed that such children are denied the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution; that the school district has violated Title VI of the Civil Rights Act of 1964, as amended; and that the school district has violated the

mandate of Section 1703(f) of the Equal Educational Opportunities Act.

## PROCEDURAL HISTORY

These are ancillary issues in this litigation which began in 1969. In *Keyes v. School District No. 1*, 413 U.S. 189, 213, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548 (1973), the Supreme Court ordered trial of the factual question of whether the Denver School Board's policy of deliberate segregation in the Park Hill Schools constituted the entire school system a dual system. Judge William E. Doyle's findings that a dual system did exist required further proceedings to ensure that the school board discharged its "affirmative duty to desegregate the entire system 'root and branch'." *Id.* That process is still continuing under this court's supervision.

The Congress of Hispanic Educators ("CHE") and thirteen individually named Mexican-American parents of minor children attending the Denver Public Schools filed a motion to intervene as plaintiffs to participate in the remedy phase hearings. Those plaintiff-intervenors were represented by attorneys from the Mexican American Legal Defense and Educational Fund (MALDEF). Plaintiff-intervenors' motion to intervene was granted by Judge Doyle at a hearing on January 11, 1974. The only record of that order is in the handwritten minutes of the deputy clerk, which note, "Motion of Mexican American Legal Defense Fund to Intervene, Ordered-Motion to Intervene is Granted." The defendants never filed an answer or any other pleading in response to the complaint in intervention.

In that original complaint, the intervenors asserted claims under the Fourteenth Amendment, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, (42 U.S.C. § 2000d). Paragraph 9 of the complaint alleged that the action was brought as a Rule 23(b)(1) and (3) class action, with the class defined as follows:

(a) All Chicano school children, who by virtue of the actions of the Board complained of in the First Cause of Action, Section III of the plaintiff's complaint, are attending segregated schools and who are forced to receive unequal educational opportunity including *inter alia*, the absence of Chicano teachers and bilingual-bicultural programs;

(b) All those Chicano school children, who by virtue of the actions or omissions of the Board complained of in the Second Cause of Action, Section IV of the plaintiff's complaint, are attending segregated schools, and who will be and have been receiving an unequal educational opportunity;

(c) All those Chicano teachers, staff, and administrators who have been the victims of defendant's discriminatory hiring, promotion, recruitment, assignment, and selection practices and whose victimization has additionally caused educational injury to Chicano students in that Chicano teachers, staff, and administrators are either nonexistent or underemployed. Additionally, the class is composed of present and future teachers, staff, and administrators who may be affected by this court's impending relief in such a manner as to detrimentally affect Chicano children within said district.

There is no record of any order by Judge Doyle certifying such a class. MALDEF lawyers actively participated in the hearings on the desegregation plans submitted by the plaintiff class and the defendant. There was no challenge to the standing of the parties they were representing.

On April 17, 1974, Judge Doyle ordered implementation of a desegregation plan based on the work of Dr. Finger, a court-appointed expert witness. Parts of that plan addressed the special interests and needs of Chicano children as urged by another expert witness, Dr. Jose Cardenas. On appeal, the Tenth Circuit Court of Appeals held that those special requirements went beyond Judge Doyle's findings. *Keyes v. School District No. 1*, 521 F.2d 465 (10th Cir.1975). The Court of Appeals ruled, in relevant part:

The [district] court made no finding, on remand, that either the School District's curricular offerings or its methods of educating minority students constituted

illegal segregative conduct or resulted from such conduct. Rather, the court determined that ... a meaningful desegregation plan must provide for the transition of Spanish-speaking children to the English language. But the court's adoption of the Cardenas Plan, in our view, goes well beyond helping Hispano school children to reach the proficiency in English necessary to learn other basic subjects. Instead of merely removing obstacles to effective desegregation, the court's order would impose upon school authorities a pervasive and detailed system for the education of minority children. We believe this goes too far.

Other considerations lead us to the same conclusion. Direct local control over decisions vitally affecting the education of children 'has long been thought essential both to the maintenance of community concern and support for public schools and to the quality of the educational process.' ... We believe that the district court's adoption of the Cardenas Plan would unjustifiably interfere with such state and local attempts to deal with the myriad economic, social and philosophical problems connected with the education of minority students.

\* \* \* \* \* \*

We remand for a determination of the relief, if any, *necessary to ensure that Hispano and other minority children will have the opportunity to acquire proficiency in the English language.* (emphasis added)

*Id.* at 482–83 (citations omitted).

After that remand, the parties agreed upon a plan to start the process of desegregation. That stipulated plan, approved by Judge Doyle in an order entered on March 26, 1976, did not contain any provisions dealing with the issues relating to limited-English language proficiency of any students. This civil action was reassigned to me immediately after the entry of that order.

On November 3, 1980, the plaintiff-intervenors filed a supplemental complaint in intervention, adding a claim under a provision of the Equal Educational Opportunities Act of 1974 (the EEOA), 20 U.S.C. §§ 1701 *et seq.* Although the supplemental complaint indicated that the parties were the same as in the original complaint, the statement of the claims expanded the group of intervenors to "those students who are limited-English proficient," without regard to native language. The supplemental complaint did not contain class action allegations. The defendant did not respond to either the original complaint or the supplemental complaint.

The filing of the supplemental complaint in intervention followed several years of unsuccessful efforts to negotiate and compromise the English language proficiency issues. The failure of those efforts is indicative of the intractable character of this controversy. Throughout several years of discovery and up to the time for trial, the defendant school district never raised any question of plaintiff-intervenors' standing and never challenged the contention that these claims should be maintained as a class action. The first challenge was made on April 26, 1982, when the district suggested that the trial date be vacated. On the last day of trial, the plaintiff-intervenors tendered an amended supplemental complaint and filed motions to add parties, and for class certification. The motion to file the amended complaint to add the additional parties was granted and those additional parties are Hispanic parents whose children now attend the Denver Public Schools. The proposed class certification was simplified to consist of all limited English proficient Hispano children in the Denver Public Schools.

## CLASS CERTIFICATION

■ The question of class certification must be considered before determining the factual and legal questions presented. It arises in an unusual, although not unique, procedural setting since the trial on the merits has already been held. *See Amos v. Board of Directors of City of Milwaukee,* 408 F.Supp. 765, 772 (E.D.Wis.1976). Anyone who has any familiarity with the history of this case knows that there has been a

*de facto* recognition of the standing of CHE in representing the Hispanic population group as a class since Judge Doyle first recognized participation by MALDEF attorneys in January, 1974. For example, in the March 26, 1976 order for implementation of the agreed pupil assignment plan, Judge Doyle said:

> The order to modify the bi-lingual program has not been fulfilled and an extension of time (to April 1, 1976) to present a proposal has been granted to the Intervenors.

In determining the awards on applications for attorneys fees, Judge Finesilver commented on the role of the plaintiff-intervenors as follows:

> Without the participation of the Congress of Hispanic Educators, the School District's largest minority group would have gone unrepresented. Their involvement assured a fair and balanced presentation of the various views, was important to the success of desegregation, and contributed to the acceptance of the plan by the Hispano community. The Congress of Hispanic Educators are a prevailing party in this litigation. *Keyes v. School District No. 1*, 439 F.Supp. 393, 400 (D.Colo.1977).

The optimistic expectation that an agreement on bilingual education could be achieved was not fulfilled and the disagreements came on for trial in 1982. At that trial, the complete program for addressing the special needs of all limited-English proficiency students was explored. Indeed, through the testimony of the witnesses and the arguments of counsel, the school district emphasized that because of the many languages spoken by the pupil population and the changes which have occurred in that population since this case was commenced, including the transient nature of attendance patterns, the scope of the problem is considerably wider than that which was defined in the pleadings prior to trial. It is clear from the evidence presented at the trial that the Denver Public Schools now serve a population which is neither bi-racial, nor tri-ethnic. It is pluralistic.

The evidence fully supports the certification of a class identified as all children with limited-English language proficiency who now attend, and who will in the future attend schools operated by the defendant district. That conclusion must, of course, be supported by the separate analysis of the record with respect to each of the requirements of Rule 23(a) of the Federal Rules of Civil Procedure.

*Numerosity.*

This prerequisite is not disputed by the defendant even if the class is limited to Spanish-speaking children with limited-English proficiency. Considering all classifications of LEP, there were more than 3,300 such children enrolled in the Denver Public Schools at the time of trial.

*Common Questions Of Law Or Fact.*

Here, there is a dispute. The defendant asserts that there is a conflict of interest between Hispanic and Indochinese students. While the arguments are focused more on the typicality and adequacy of representation prerequisites, the possibility of such a conflict must also be considered here. I do not find that conflict at this stage of the proceeding. We are now concerned with the question of whether the school district has failed to follow the requirements of two federal statutes and whether there has been a denial of equal protection of the laws. From the evidence presented at trial, I find that the limitations arising from the influence of a language other than English are the same without regard for the particular language affecting the student. Accordingly, there is a common question of what obligation is owing to all LEP children in the district.

Additionally, to limit the class to Spanish speakers would be inconsistent with the remand from the Tenth Circuit Court of Appeals quoted on page 4 of this opinion. There, the appellate court directed "a determination of the relief necessary to ensure that Hispano *and other minority children* will have the opportunity to acquire proficiency in the English language." *Keyes v. School District No. 1*, 521 F.2d at 483. In the context of the opinion as a

whole, it is clear that the reference to "other minority children" refers to all children with limited-English language proficiency.

The issues common to all children of limited-English language proficiency now or hereafter enrolled in the Denver Public Schools to be considered in this litigation are whether the school district has denied them equal protection of the laws, whether the defendant has failed to follow the requirements of Title VI of the Civil Rights Act of 1964, as amended, and whether the school district has failed to follow the mandate of Section 1703(f) of the Equal Educational Opportunities Act.

*Typicality.*

Before trial of the language issues, CHE and the original intervenors were particularly identified with the Hispanic community. The additional intervenors who participated in the trial are also from that community. The typicality prerequisite is met if the claims of students with limited-English proficiency who are affected by the Spanish language are representative of the claims of children who are affected by other languages. I find that they are representative and therefore typical because there are Spanish-speaking children who do not have the opportunity to participate in the special bilingual programs provided for some Spanish speakers and who are, therefore, no different from speakers of other languages for whom there are no comparable programs in Denver. Whatever conflict may exist for those Spanish-speaking children who are receiving bilingual instruction, and who are thus provided better opportunities than those given to Indochinese or other children who are classified as LEP, there are other Spanish speakers who are attending schools under the same programs for those who speak Asian languages and the other identified language groups shown in the trial record in this case.

*Adequacy of Representation.*

The determination of this prerequisite has been made easy by the delay in class certification. The principal question in deciding whether the representative parties will fairly and adequately protect the interests of the class is the adequacy of the attorneys who are in appearance. One need only read the record of the trial and the briefs filed for the plaintiff-intervenors to conclude that their counsel are highly competent lawyers who have vigorously asserted the interests of all present and future LEP pupils involved with the Denver Public Schools.

Having determined that all of the prerequisites required under Rule 23(a) are met, the court must then consider whether a class action is maintainable under one of the subsections of Rule 23(b). Again, the answer is self-evident from a review of the record in this case. The school district has designed its program in a manner which can be considered as action or refusal to act on grounds generally applicable to all LEP children and, therefore, the class action should be maintained under Rule 23(b)(2).

This court has not disregarded the defendant's concerns about the possibility that non-Hispanic LEP children may be denied their constitutional protection of due process of law by being made a part of the class certified by this court. It is apparent that their rights and interests have been fully considered by the manner in which the evidence and legal arguments have been presented by plaintiff-intervenors' counsel in this case and by the procedural and evidentiary rulings made by this court to this time. It is appropriate, as plaintiff-intervenors' counsel have suggested, to distinguish between the liability and remedy phases of a class action lawsuit and, in the event of any remedy hearings which may involve a conflict, this court has the authority to change both the class certification and to order the separate representation of sub-classes.

### SECTION 1703(f) OF THE EEOA

█ In enacting the Equal Educational Opportunities Act in 1974, the United States Congress was reacting to the many court cases in which the transportation of students from their residential neighborhoods was used as a means for removing

some of the effects of segregation from the operation of a dual school system. The statement of policy in Section 1701 includes a specific statement of support for neighborhood schools. That section, in its entirety, is as follows:

(a) The Congress declares it to be the policy of the United States that—

(1) all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin; and·

(2) the neighborhood is the appropriate basis for determining public school assignments.

(b) In order to carry out this policy, it is the purpose of this sub-chapter to specify appropriate remedies for the orderly removal of the vestiges of the dual school system.

20 U.S.C. § 1701.

The legislative findings in Section 1702 of the EEOA include explicit criticism of extensive use of student transportation and, in the following language from Section 1702(a)(6), express a sense of frustration with the guidelines provided by the courts:

(6) the guidelines provided by the courts for fashioning remedies to dismantle dual school systems have been, as the Supreme Court of the United States has said, "incomplete and imperfect," and have not established, a clear, rational, and uniform standard for determining the extent to which a local educational agency is required to reassign and transport its students in order to eliminate the vestiges of a dual school system.

From the legislative findings, the Congress reached the following conclusion set forth in Section 1702(b):

(b) For the foregoing reasons, it is necessary and proper that the Congress, pursuant to the powers granted to it by the Constitution of the United States, specify appropriate remedies for the elimination of the vestiges of dual school systems, except that the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments to the Constitution of the United States.

In this litigation, the transportation of students has been used as a part of the effort to remedy the effects of the past segregative policies in the Denver school system. Busing has been the primary means for the removal of racially isolated schools. That aspect of the case is not now directly under consideration, but, as will appear, it is unrealistic to parse out particular components of a school system when considering the fundamental issue of an equal educational opportunity for all students within the school population. The Congress showed the same perception in defining unlawful practices in Section 1703 of the EEOA, which reads as follows:

No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—

(a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;

(b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with subpart 4 of this title, to remove the vestiges of a dual school system;

(c) the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student;

(d) discrimination by an educational agency on the basis of race, color, or national origin in the employment, employment conditions, or assignment to

schools of its faculty or staff, except to fulfill the purposes of subsection (f) below;

(e) the transfer by an educational agency, whether voluntary or otherwise, of a student from one school to another if the purpose and effect of such transfer is to increase segregation of students on the basis of race, color, or national origin among the schools of such agency; or

(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. § 1703.

The present focus of attention is on subsection (f) of Section 1703. That subsection was analyzed carefully by the United States Court of Appeals for the Fifth Circuit in *Castaneda v. Pickard,* 648 F.2d 989 (5th Cir.1981), a case which is very instructive in the present controversy. There, the Court made the following pertinent observations:

We note that although Congress enacted both the Bilingual Education Act and the EEOA as part of the 1974 amendments to the Elementary and Secondary Education Act, Congress, in describing the remedial obligation it sought to impose on the states in the EEOA, did not specify that a state must provide a program of "bilingual education" to all limited English speaking students. We think Congress' use of the less specific term, "appropriate action," rather than "bilingual education," indicates that Congress intended to leave state and local educational authorities a substantial amount of latitude in choosing the programs and techniques they would use to meet their obligations under the EEOA. However, by including an obligation to address the problem of language barriers in the EEOA and granting limited English speaking students a private right of action to enforce that obligation in § .1706, Congress also must have intended to insure that schools made a genuine and good faith effort, consistent with local circumstances and resources, to remedy the language deficiencies of their students and deliberately placed on federal courts the difficult responsibility of determining whether that obligation had been met.

Congress has provided us with almost no guidance, in the form of text or legislative history, to assist us in determining whether a school district's language remediation efforts are "appropriate." Thus we find ourselves confronted with a type of task which federal courts are ill-equipped to perform and which we are often criticized for undertaking—prescribing substantive standards and policies for institutions whose governance is properly reserved to other levels and branches of our government (i.e., state and local educational agencies) which are better able to assimilate and assess the knowledge of professionals in the field. Confronted, reluctantly, with this type of task in this case, we have attempted to devise a mode of analysis which will permit ourselves and the lower courts to fulfill the responsibility Congress has assigned to us without unduly substituting our educational values and theories for the educational and political decisions reserved to state or local school authorities or the expert knowledge of educators.

*Castaneda v. Pickard,* 648 F.2d 989, 1009 (5th Cir.1981).

The suggested analysis is to ask three questions. First, is the school system pursuing a program based on an educational theory recognized as sound or at least as a legitimate experimental strategy by some of the experts in the field? Second, is the program reasonably calculated to implement that theory? Third, after being used for enough time to be a legitimate trial, has the program produced satisfactory results? *United States v. State of Texas,* 680 F.2d 356, 371 (5th Cir.1982).

### THE EVIDENCE

*Limited-English proficiency children in the district.*

School District No. 1 has a duty to identify, assess and record those students who come within the provisions of the English

Language Proficiency Act, enacted by the Colorado General Assembly in 1981, codified at C.R.S. §§ 22–24–101 to 106 (1982 Cum.Supp.). The district uses classifications called Lau categories. These Lau categories were defined originally by the Department of Health, Education and Welfare ("HEW"), now the Department of Education, as part of its Lau Guidelines, which HEW drafted as administrative recommendations following the Supreme Court's decision in *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

Section 22–24–103(4) of the Colorado statute does not use the words "Lau A, B and C," but the definitions provided therein track the Lau categories. That section provides for the classification of children as follows:

> "Student whose dominant language is not English" means a public school student whose academic achievement and English language proficiency are determined by his local school district, using instruments and tests approved by the department, to be impaired because of his inability to comprehend or speak English adequately due to the influence of a language other than English and who is one or more of the following:
>
> (a) A student who speaks a language other than English and does not comprehend or speak English; or
>
> (b) A student who comprehends or speaks some English, but whose predominant comprehension or speech is in a language other than English; or
>
> (c) A student who comprehends and speaks English and one or more other languages and whose dominant language is difficult to determine, if the student's English language development and comprehension is:
>
> (I) At or below the district mean or below the mean or equivalent on a nationally standardized test; or
>
> (II) Below the acceptable proficiency level on an English language proficiency test developed by the department.

C.R.S. § 22–24–103(4).

For the 1981–82 school year, the defendant school district used a survey which identified 3,322 children as limited-English speaking. Of that total count, 2,429 were Lau categories A and B, and 893 were Lau category C, as those terms are defined under the Colorado English Language Proficiency Act. There were 42 separate language groups identified among these students in the Denver Public Schools.

At the elementary level (Grades K–6) 1,639 students were identified as Lau A and B and 637 as Lau C. In the secondary grades (7–12) there were 790 Lau A and B students and 256 Lau C. During the 1981–1982 school year, the school district operated 117 schools—88 elementary, 19 junior high, and 10 senior high schools—with a total enrollment in grades 1–12 of 54,644 students. Lau Category A and B students in the 42 language groups attended 83 of the school district's 88 elementary schools and there were Lau A and B students in all 19 of the junior high schools and all 10 of the senior high schools.

Although 42 languages were represented among the district's limited-English proficiency children in 1981–82, the majority fell into two language groups. There were 1,851 children, or 55.72% of the total number of LEP students at all grade levels, whose other language was Spanish. The second largest group, comprising 36.48% of all LEP children in the district, consisted of 1,212 children who are influenced by one of four Indochinese languages: Cambodian (116); Hmong (417); Lao (174); and Vietnamese (505).

At the elementary level, 919 Spanish language students were identified as Lau A and B, which represents 2.8% of the K–6 population. At the time of the trial, 80% of the Spanish language Lau A and B children were in grades K–3. At the junior high level, 146 Spanish language A and B students were identified, representing 1.07% of the junior high school population. At the senior high school level, the survey identified 86 Spanish language A and B students or two-thirds of one percent (.67%) of the senior high population. District-wide the Spanish language A and B population K–12 totaled 1,151 or 1.9% of the total

district enrollment. An additional 700 Spanish language students were identified as Lau category C.

*The school district's curriculum.*

At the elementary level, a transitional bilingual program exists at twelve elementary schools: Boulevard, Bryant-Webster, Crofton, Del Pueblo, Fairmont, Fairview, Garden Place, Gilpin, Greenlee, Mitchell, Swansea and Valdez. At all those schools except Valdez, the program is for grades K–3; at Valdez it is provided for grades K–6. Not all classrooms in these schools are designated bilingual classrooms; most have one designated bilingual classroom for each grade level in the program. At Fairmont there are two designated bilingual classrooms for each grade level K–3. While only 13.4% of the total number of limited-English proficiency children enrolled in the district (Lau A, B and C children, including all 42 language groups) were receiving instruction in bilingual classrooms during 1981–82, 31.03% of the total number of Spanish speaking, elementary level limited-English speaking children were in bilingual classrooms.

No speakers of languages other than Spanish, and no Spanish speaking Lau C children receive instruction in designated bilingual classrooms. The bilingual classrooms are intended to have about 40% limited-English proficiency children, and 60% English proficient children, but the actual figures deviate from this goal. Students who are placed in bilingual classrooms merge with the rest of the student body for classes in art, music and physical education, and for lunch and recess.

There are differences in the teaching staff in the desegregated bilingual schools. Each bilingual classroom is taught by a certified teacher, but many of those teachers are monolingual English. Most teachers, including all of the monolingual English teachers, have a bilingual aide to assist in communicating with those children who do not speak English. It is a fair inference that any instruction in Spanish, in classrooms led by monolingual English teachers, occurs through these bilingual aides. In several designated bilingual classrooms,

there are full or part-time ESL (English as a Second Language) tutors to assist in English language instruction. In other classrooms ESL is taught by the teachers and aides.

In addition, each bilingual school, except for Mitchell, has a bilingual resource teacher who serves in an administrative and supportive role. (Del Pueblo and Valdez have two bilingual resource teachers, while Bryant-Webster and Greenlee have half-time bilingual resource teachers.) The resource teacher's duties are extensive, including: coordinate between the classroom teacher and the aide in establishing an instructional program; provide technical and other assistance to bilingual classrooms; coordinate the total bilingual effort within the school; meet weekly with the teachers and aides to discuss student progress and other program concerns; provide at least two hours of in-service training to the aides weekly; develop curriculum and materials; involve parents and the community in the program; assess and evaluate limited-English speaking children; diagnose their needs and prescribe specialized curricula; demonstrate techniques and methodologies involved in bilingual instruction, second language acquisition, ESL, and Spanish oral language development; read to children in Spanish; and work with children on conceptual development using the child's native language. All the bilingual resource teachers are bilingual.

For those Lau A and B elementary level children who are not in designated bilingual classrooms—about 1,200 in all languages and about 500 Spanish-speaking children—the district provides two modes of ESL instruction. Four elementary schools—Brown, Cheltenham, Goldrick and Mitchell—have a full-time ESL teacher. The remaining elementary schools (and the non-Spanish speaking Lau A and B children in the twelve bilingual schools) are served by full or part-time tutors who instruct in ESL. All ESL instruction, whether it is by a teacher or tutor, occurs on a "pull-out" basis: the children are taken from their regular classrooms to receive from 30 to 60 minutes of ESL instruction each day. The

school district's 55 tutors serve Lau A and B children in 75 elementary schools, generally meeting with groups of two to four children at one time, and tutoring an average of 20 children per six-hour day. For the rest of the day, the child receives content instruction in the regular classroom, entirely in English. Some regular classroom teachers are bilingual and the child may receive some content instruction in his native language through those teachers. The elementary ESL program uses the "IDEA Kit," which employs pictures, actions and other materials to teach Lau A and B children oral skills in English.

At the secondary level, there is no program comparable to that found in the designated bilingual elementary schools.

The principal program for secondary level limited-English proficiency students is ESL taught by teachers and tutors for about 45 minutes each day. The ESL curriculum consists of four ·sequential levels of reading, writing and conversation instruction: levels I and II are for Lau A students; levels III and IV are for Lau B students. Lau C students do not receive ESL instruction unless they choose to take courses offered as electives, such as "Practical English," "Language Development in English," or language lab courses.

The October, 1981, survey identified 146 Spanish A and B Category students in the junior high schools. Of this number 121 or 82.8% attended schools with ESL programs. 108 of those students (89.2%) were in ESL programs conducted by a bilingual teacher.

In the senior high schools ESL programs are available in schools attended by 78 of the 86 identified Spanish speaking A and B students. In addition, 316 A and B students in other identified language groups attended schools with structured ESL programs.

At four of the district's thirty secondary schools—Hill Junior High, Hamilton Junior High, Manual High, and Thomas Jefferson High—ESL instruction is not available. At the time of trial there were either no limited-English speaking students, or only Lau C students, at Hill and Hamilton. For Lau

A and B students at secondary schools without established ESL programs, and for some limited-English speaking students at other secondary schools in the district, the Fred Thomas Career Center provides ESL instruction. Students travel to the Center, which had an enrollment of 55 students in 1981–82, for ESL instruction by a teacher and two aides. ·

In addition to the specific ESL programs, course materials in content areas of American History, geography, physical science, natural science, mathematics, sex education, health and hygiene, and general hygiene have been translated into the five major language groups for use in the school curriculum. Materials have also been translated for use in the home economics, physical education, and industrial arts areas. Ms. Bonilla, the director of this program, is also engaged in the development of a program known as Transference of Learning from Native Language to English through Content Area Cassette Tapes and Supplementary Materials. This is a project designed to meet the needs of two populations—those students who are literate in their native language and need to develop cognitive skills while learning English, and, secondly, those who are illiterate in their own language and thus need to hear the content area material in order to have an understanding of it.

A final component of the school district's program is a summer ESL program. According to Mr. Hal Anderson, who directs the program, it was expected to serve from 400 to 500 Lau A and B children in 22 classrooms. Students are selected for the summer program based on teacher referrals.

*Testing.*

The identification of limited-English speaking children, and the placement of those children in Lau categories A, B and C, does not occur through a formal testing process. Instead, the school district employs the Lau questionnaire. The questionnaire is filled out by each child's parents and is reviewed by a teacher. If the parents and teacher concur that the child is

not limited-English speaking, the district determines him to be ineligible for the bilingual/ESL program. It is common for parents to overstate the language abilities of their children, and the teacher's involvement in the questionnaire is intended to safeguard against that. Most of the district's teachers are not trained in linguistics, bilingual education, other languages, or in detecting language problems. At the secondary level those students who are identified as LEP are given an ESL test to place them in ESL level I, II, III or IV.

To measure the progress of elementary children receiving ESL instruction, the school district uses the IDEA Test, which is a part of the IDEA Kit. In addition to the IDEA Test, the district relies on the opinions of its teachers and staff to determine whether and how much the child has progressed. If the student achieves "mastery" of the IDEA Test, he leaves the ESL program, unless his tutor or teacher determines that it would not be appropriate to "mainstream" him at that point. The IDEA Test is also used for those students receiving instruction in designated bilingual classrooms, because part of the transitional bilingual program is ESL instruction through the IDEA Kit. If the child achieves mastery in the test, he will be released from the bilingual program. Of course, if a child becomes proficient in English during the school year he can remain in the bilingual classroom and simply do without the ESL instruction, effectively joining the English speaking children already in the classroom.

At the secondary level, the school district measures progress in the ESL program through the Structure Test of English Language, or STEL. That test is administered twice a year, on a pre/post basis.

The school district does not keep records of the progress of children who have left either the bilingual or ESL program. There is no continuing support provided to students who have exited from either program, and the district does not compare their performance against that of non-limited-English speaking children. None of the tests used by the district measures the capabilities of limited-English speaking children in their native languages in either language skills or content areas.

*Staffing.*

Teachers in designated bilingual classrooms are placed by the school district's personnel office, rather than by the bilingual program administrator, Mr. Moses Martinez. These placement decisions do not depend upon the teacher's proficiency in a second language or in bilingual instruction skills. For example, the personnel office often will assign tenured teachers or teachers already working within a particular school, to fill vacancies in bilingual classrooms, even though those teachers are not bilingual and have no training for bilingual teaching, and even though a non-tenured bilingual teacher is available. There is no state endorsement for bilingual classroom teachers. Selection is based on an oral interview. The district does not administer a written test to evaluate either language skills or bilingual instruction skills.

No special training is required for ESL teachers and there is no state endorsement for ESL teachers. There is no formal district procedure to assess them for language proficiency or ESL teaching skills. ESL teachers are not required to be bilingual.

During the 1980–81 school year, over 200 of the district's teachers—predominantly teachers who did not lead designated bilingual classrooms or teach ESL—received an 18-hour in-service training course which covered the basics of linguistics, ESL (including the IDEA Kit curriculum), and multicultural awareness. The school district did not follow up on whether those teachers actually used such training in their classrooms; nor did the school district know whether those teachers taught in classrooms or schools with large numbers of limited-English speaking children.

There are regular classroom teachers in the district who are bilingual, generally in English and Spanish. The evidence did not show the number of bilingual teachers who were working in the district during the 1981–82 school year.

The district's ESL tutors are classified as Paraprofessional III staff, which means they must have two years of college or equivalent experience. According to Mr. Martinez, many of the tutors have college and graduate degrees; a few have less than two years of college. ESL tutors are not required to have state certification for teaching, previous training in language acquisition or ESL instruction, bilingual capabilities, or past experience teaching ESL. The school district provides a two-day training session for new ESL tutors at the start of each school year. If tutors are hired during the school year (due to vacancies, which occur frequently), they receive one day of training at the office of bilingual education, and two days of observation in the field.

Bilingual classroom aides are designated as Paraprofessional II staff, which means they must have completed high school. Aides' bilingualism is measured through an oral interview only, without any written examination or classroom observation. The evidence does not disclose what, if any, training is required for bilingual aides. Bilingual resource teachers must be bilingual. As with other teachers, there is no written instrument for determining their bilingualism; instead, that determination is based on an oral interview.

*Program Administration.*

The school district's program for limited-English speaking students is directed by the Department of Bilingual and Multi-cultural Education headed by Mr. Martinez. That office is responsible for the coordination of the programs of Bilingual Education, English for Speakers of Other Languages, ESL Tutorial Programs and others. The staff consists of one secretary, three clerks, four teachers on special assignment, six paraprofessionals who serve as translators and interpreters, one paraprofessional for community liaison, one paraprofessional resource librarian, and instrumental consultants. The community liaison paraprofessional works in the elementary bilingual program, does some liaison work at the secondary level, and works actively with Indochinese parents. She also teaches an English class for parents.

The six paraprofessionals include native language speakers of Hmong, Laotian, Vietnamese, Cambodian, and Spanish. The paraprofessionals are primarily responsible for translating curriculum, and interpreting and translating messages and information for the parents of limited-English speaking students. The curriculum translations include units in social studies, science, and mathematics in the five major languages.

*Program growth and funding.*

The program of services for limited-English speaking students in the Denver Public Schools has been developed with the assistance of expert consultants from the Colorado Department of Education and from Bueno Bilingual Service Center at Boulder, Colorado. The current program began in September, 1980.

There has been an increase in the number of bilingual teachers from three (3) to thirty-six (36), an increase in tutors from twelve (12) to seventy-two (72), an increase of four (4) schools at the elementary level with ESL programs, and the placement of seventeen (17) tutors in addition to the regular classroom teachers and full-time ESL teachers in twenty-seven (27) secondary schools.

During this same period, the school district substantially increased its funding for bilingual and ESL instruction from $139,326 in 1979 to $1,293,625 at the time of the trial. This commitment is in addition to the salaries of the regularly assigned teachers in the program. During the 1981–82 school year, the school district received $81,687 under a Title VII Computer Demonstration Grant, $137,200 under the Transition Act for Refugee Children, and $991,137 in state funds under the English Language Proficiency Act.

The funds from the state are computed pursuant to the formula set out in the Colorado English Language Proficiency Act, C.R.S. § 22–24–104. That section of the Act sets limits on the funding allowed for limited-English speaking children, and allots funds on a per-student basis. The maximum amount is $400 per year for a Lau A or B child, and $200 per year for a

Lau C child as that term is used in the Act. In addition, the Act prohibits funding of a particular student's educational program for longer than two years. *Id.* § 22–24–104(3).

## HAS DENVER DESIGNED A PROGRAM BASED ON A SOUND EDUCATIONAL THEORY?

The defendant district has a freedom of choice among several educational theories which experts have recognized as valid strategies for language remediation in public schools. It is, of course, subject to the requirements of Colorado statutes. While the Colorado English Language Proficiency Act is essentially a funding program, it does establish an affirmative duty on Colorado school districts in § 22–24–105 which reads as follows:

> (1) It is the duty of each district to:
> (a) Identify, through the observations and recommendations of parents, teachers, or other persons, students whose dominant language may not be English;
> (b) Assess such students, using instruments and techniques approved by the department, to determine if their dominant language is not English;
> (c) Certify to the department those students in the district whose dominant language is not English;
> (d) Administer and provide programs for students whose dominant language is not English.

The state has not, however, directed the use of any particular type of language program.

Denver has elected to use what is called a "transitional bilingual approach" which is well described in the following language from the Denver Public Schools' Bilingual Program Model for the 1981–82 School Year:

> The intent of bilingual education is to facilitate the integration of the child into the regular school curriculum. English is not sacrificed, in fact it is emphasized; the native language is used as a medium of instruction to ensure academic success in content areas such as math, social studies, etc., while the child at the same time is acquiring proficiency of the English language.

(Intervenors' Exhibit 26).

The parties are in agreement and the testifying experts have all said that this is a recognized and satisfactory approach to the problem of educating LEP children. Mr. Martinez testified that this is a two-pronged approach. One is to provide the student with an opportunity to develop English language skills and the other is to provide content area to him in a language he understands while he is learning English. The experts agree that this approach not only should enable LEP students to enter the mainstream of instruction, it also helps to overcome the emotional barriers of fear, frustration, discouragement and anger by providing understandable content instruction in their native language during the transitional phase.

## HAS DENVER PURSUED ITS PROGRAM WITH ADEQUATE RESOURCES, PERSONNEL AND PRACTICES?

The elementary bilingual classroom program is the best which Denver has to offer LEP children. Accordingly, the analysis should begin with a focus on the deficiencies in that program.

The key to an effective elementary bilingual classroom is the ability of the teacher to communicate with the children. Thus, if it is expected that understandable instruction will take place, there must be assurance that the teacher has the necessary bilingual skills. That is not the fact in Denver.

Teachers are designated as bilingual in Spanish and English based on an oral interview. There are no standardized testing procedures to determine the competence of the bilingual teacher in speaking and writing both languages. Accordingly, it is inappropriate to assume that effective communication is taking place even with the fortunate few Lau A Spanish speaking students who are assigned to bilingual class-

rooms with bilingual teachers in the twelve elementary schools having that program.

Given the district's declaration of a transitional bilingual policy and the obvious need for the services of competent bilingual teachers, it would be reasonable to expect that the placement of teachers with those skills would be matched with the programs in the designated schools. That is not the case in Denver.

The assignment of teachers to bilingual schools in the defendant district is accomplished by the same procedure used for the assignment of teachers to all other schools. Teachers with tenure have preferential rights for assignment to vacancies according to their seniority. Accordingly, a monolingual English teacher may fill a vacancy in a bilingual classroom at a bilingual school even though a qualified bilingual teacher with less seniority is available for placement there. Likewise, tenured monolingual teachers cannot be removed from a bilingual classroom to create a vacancy for a competent bilingual teacher. The justification for this contradiction of common sense is that the movement and placement of teachers is restricted by personnel regulations and contractual commitments.

The ESL component of the program is being delivered by ESL designated instructors who have not been subjected to any standardized testing for their language skills and they receive very little training in ESL theory and methodology. The record shows that in the secondary schools there are designated ESL teachers who have no second language capability. There is no basis for assuming that the policy objectives of the program are being met in such schools. The tutorial program relies on paraprofessionals who may have second language skills but who are not required to show any competence or experience with content area knowledge, or teaching techniques, and who receive scant in-service training.

It should be noted that the inadequacy of the delivery system for the bilingual education program in Raymondville, Texas was one of the specific defects which the court required to be remedied in the *Castaneda*

*v. Pickard, supra,* case from which opinion the following comment is taken:

The record in this case thus raises serious doubts about the actual language competency of the teachers employed in bilingual classrooms by RISD and about the degree to which the district is making a genuine effort to assess and improve the qualifications of its bilingual teachers. As in any educational program, qualified teachers are a critical component of the success of a language remediation program. A bilingual education program, however sound in theory, is clearly unlikely to have a significant impact on the language barriers confronting limited English speaking school children, if the teachers charged with day-to-day responsibility for educating these children are termed "qualified" despite the fact that they operate in the classroom under their own unremedied language disability. The use of Spanish speaking aides may be an appropriate interim measure, but such aides cannot, RISD acknowledges, take the place of qualified bilingual teachers .... Nor can there be any question that deficiencies in the in-service training of teachers for bilingual classrooms seriously undermine the promise of the district's bilingual education program. Until deficiencies in this aspect of the program's implementation are remedied, we do not think RISD can be deemed to be taking "appropriate action" to overcome the language disabilities of its students.

648 F.2d at 1013.

The Spanish speakers in the elementary bilingual classrooms are the most fortunate of the limited-English proficient children. Most LEP students are not in those classrooms. Accordingly, it follows that for those students there is less commitment and effort to achieve implementation of the transitional bilingual policy. Significant numbers of limited-English proficient children attend schools which are not bilingual. Some of the secondary students from certain schools are brought together for extended ESL services at the Fred Thomas Center. That type of "clustering" has not

been used elsewhere. What appears from the record is that outside of the bilingual classrooms, the Lau A children and perhaps the Lau B children, are not receiving content area instruction in a language which they understand and that, at best, some remedial oral English training is being given to them.

The emphasis on the acquisition of oral English skills for LEP students is another cause for concern. The record indicates that on the average, ESL instruction by a teacher or tutor is limited to 40 minutes per day of remedial English instruction using an audiolingual approach. While there is no doubt that acquisition of oral English skills is vital for the students' participation in classroom work, it is equally obvious that reading and writing skills are also necessary if it is expected that "parity in participation" in the total academic experience will be achieved.

Another matter of concern is the apparent disregard of any special curriculum needs of Lau C children. The defendant considers Lau C children to be bilingual, presumably with equal proficiency in English and another language. The apparent assumption is that such students need not be participants in a remedial English language program. That view disregards the other element of the applicable definition in the Colorado Language Proficiency Act that the English language development and comprehension of such bilingual students is at or below the district mean or below an acceptable proficiency level on a national standardized test or a test developed by the Colorado Department of Education. Lau C students are within the class of persons for whom there is a statutory duty under both the Colorado Act and § 1703(f). Denver is not meeting that obligation.

The defendant's program is also flawed by the failure to adopt adequate tests to measure the results of what the district is doing. The operative philosophy exhibited in the evidence is that there is a "good faith" effort to provide "some service" to as many LEP students as possible. The lack of an adequate measurement of the effects of such service is a failure to take

reasonable action to implement the transitional bilingual policy.

In summary, what is shown by this record is that the defendant district has failed, in varying degrees, to satisfy the requirements of § 1703(f) of the Equal Educational Opportunities Act.

The defendant seeks to justify its program by talking in numbers, and quoting from the concurring opinion of Justice Blackmun in *Lau v. Nichols,* 414 U.S. 563, 572, 94 S.Ct. 786, 791, 39 L.Ed.2d 1 (1974) and from the opinion in *Serna v. Portales Municipal Schools,* 499 F.2d 1147 (10th Cir.1974). There are two pertinent observations. First, the numbers of Lau A, B and C children for whom appropriate action has not been taken are substantial and significant. Second, the importance of numbers in an equal protection analysis under the Constitution is materially different from their use in considering the adequacy of compliance with the statutory mandate of § 1703(f). As the plaintiff-intervenors have observed, under § 1706, any individual denied an equal educational opportunity as defined in the Act may institute a civil action for private relief.

## HAS THE DENVER TRANSITIONAL BILINGUAL PROGRAM ACHIEVED SATISFACTORY RESULTS?

This is the most difficult question in the *Castaneda* case analysis because it implies the establishment of a substantive standard of quality in educational benefits. It is beyond the competence of the courts to determine appropriate measurements of academic achievement and there is damage to the fabric of federalism when national courts dictate the use of any component of the educational process in schools governed by elected officers of local government.

Fortunately, it is not now necessary to discuss this question because of the findings of the district's failure to take reasonable action to implement the bilingual education policy which it adopted. The inadequacies of the programs and practices shown in this record make it premature to consider any analysis of the results. More-

over, the program is still under development.

What is subject to comment are two very significant indications of failure in achieving the objective of equal educational opportunity for LEP children. One is the number of Hispanic "drop-outs" peaking in the tenth grade. There is an interesting relationship between that surge of drop-outs and the sharp decline in the overall number of Lau C category students between grades 7–9 and grades 10–12. A second indicator of failure is the use of "levelled English" handouts for the district's LEP student population in the secondary schools. The evidence includes illustrations of such handouts and it is apparent from examining those exhibits that they are not comparable to the English language textbooks. The use of such materials is an acknowledgement by the school district that the LEP students have failed to attain a reasonable parity of participation with the other students in the educational process at the secondary school level.

## CLAIMS FOR DENIAL OF EQUAL PROTECTION AND VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

In *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) the Supreme Court held that the failure of the San Francisco school system to provide meaningful education to non-English-speaking Chinese students had the effect of denying them equal educational opportunity in violation of § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Title VI). The Court did not find it necessary to consider whether that was also a violation of the Equal Protection Clause of the Fourteenth amendment to the United States Constitution. Here, it is not necessary to consider either the constitutional question or Title VI. Section 1703(f) is a much more specific direction and to take appropriate action under it would necessarily redress any violation of the equal educational opportunities requirements of Title VI of the Civil Rights Act of 1964 and of the Constitution. It may be observed parenthetically, that the vitality of *Lau v. Nichols, supra,* has been questioned since *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). *See* discussion in *Otero v. Mesa County Valley School District No. 51,* 470 F.Supp. 326, 330 (D.Colo.1979), *aff'd on other grounds* 628 F.2d 1271 (10th Cir.1982). If *Bakke* has altered *Lau,* to require a discriminatory intent, the evidence in the record in this case does not support a finding of such an intent with respect to Hispanic or any other language group.

The inquiry is not necessary here because it is clear from the plain language of the statute and from the opinion in *Castaneda, supra,* that the affirmative obligation to take appropriate action to remove language barriers imposed by 20 U.S.C. § 1703(f) does not depend upon any finding of discriminatory intent, and a failure to act is not excused by any amount of good faith.

### REMEDY

The defendant district has amply demonstrated the many practical difficulties involved in attempting to take appropriate action to achieve equal educational opportunity for the limited-English proficiency student population. Denver does have public education burdens which are different from other districts in the state of Colorado. It serves a core city community. Students with many different language backgrounds and varying degrees of literacy in any language enter and leave the public schools of Denver, at all grade levels, and without any predictable patterns. This creates uncertainties making both the planning and delivery of remedial language services very difficult. The problem is further complicated by the great diversity of cultural and socio-economic conditions among the pupil population.

It is unreasonable to expect that the school district could provide a full bilingual education to every single LEP student who attends or will ever attend a Denver Public School. The law does not require such perfection. But the defendant does have

the duty to take appropriate action to eliminate language barriers which currently prevent a great number of students from participating equally in the educational programs offered by the district.

The findings made in this memorandum opinion compel the conclusion that the defendant has failed to perform this duty. Accordingly, under § 1706 of the EEOA, the members of the plaintiff-intervenors' class are entitled to "such relief as may be appropriate." That will include changes in the design of the program and in the system for delivery of services. Such changes must remedy the failure to give adequate consideration to Lau classifications in the pupil assignment plan; the failure to consider the need to serve Lau C children; the lack of adequate standards and testing of the qualifications for bilingual teachers, ESL teachers, tutors and aides; the lack of adequate tests for classifying Lau A, B and C students; the failure to provide remedial training in the reading and writing of English; the lack of adequate testing for effects and results of the remedial program provided to the students; and the absence of any standards or testing for educational deficits resulting from their lack of participation in the regular classrooms.

These changes will increase the capacity of the system. That alone will not be effective. There must be a change in the institutional commitment to the objective and a recognition that to assist disadvantaged children to participate in public education is to help them enter the mainstream of our social, economic and political systems. The resulting benefits to the community are self-evident and the production of such benefits is the purpose of tax supported education in the United States. "[E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." *Plyler v. Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982). The

character of the disadvantage, whether it results from racial identities or the language influences of different ethnicity, is relevant only to the methodology to be employed. Throughout the trial and in the post trial brief, the defendant district has consistently claimed that there has been a good faith effort to provide some service to every student in the district who needs assistance in gaining proficiency in English. To the extent that "good faith" is equated with a lack of discriminatory intent or an absence of a complete disregard for students who are disadvantaged by a lack of English language proficiency, the record supports that contention. That, however, is not an adequate defense to claims under 42 U.S.C. § 1706. What is required is an effort which will be reasonably effective in producing the intended result of removing language barriers to participation in the instructional programs offered by the district.

. Whether that effort will be made internally through the normal processes of local government or externally, through the procedures of litigation in this court, will depend upon the degree of acceptance of responsibility by those who direct the defendant district. Those who are most critical of this nation's civil rights laws and court decisions must surely realize that the need for the use of the coercive forces of the legal system is in inverse proportion to the degree of recognition that the viability of a pluralistic democracy depends upon the willingness to accept all of the "thems" as "us." Whether the motives of the framers be considered moralistic or pragmatic, the structure of the Constitution rests on the foundational principle that successful self-governance can be achieved only through public institutions following egalitarian policies.

The approach to developing a remedy for the defendant's failure to obey the congressional mandate in 42 U.S.C. § 1703(f) must be considered in the complete context of this civil action. The record which was before the Tenth Circuit Court of Appeals at the time of its rejection of the "Cardenas plan" aspects of the desegregation order in

1975 did not include any consideration of the claims under that statute. Indeed, the enactment of the EEOA in 1974 is one of the legal developments which occurred during the pendency of this case. Consideration of the claims concerning language remediation is a new facet in this old problem.

During the course of this litigation, this court has repeatedly stressed the importance of recognizing that disestablishing a dual school system and creating a unitary system with equal educational opportunity requires attention to all aspects of public education. Unfortunately, the record of this case shows that those who have governed the district during the past decade have consistently centered their attention on the shibboleth of "forced busing." The requirement that some students must be transported from their residential areas to achieve a mix of racial and ethnic groups in individual schools has never been intended to be more than a lever to try to energize other efforts to ameliorate the historical disadvantages of race and national origin in a society which has long been dominated by a single group. Limited-English proficiency is one of those disadvantages.

The Congress had justification when, in § 1702 of the EEOA, they criticized the failure of the courts to articulate adequate guidance for local public officials in desegregation cases. The Denver Board of Education has expressed the same frustration. Yet, it is noted that the legislative mandate to take "appropriate action to overcome language barriers" appearing in § 1703(f) is not a particularly helpful contribution. As observed in the quotations from the *Castaneda* opinion, the lack of precision in that phraseology has resulted in a return to the courts to litigate these issues.

Perhaps what Congress did achieve is to give added emphasis to the importance of the *educational opportunities* which should be provided and to remind those who govern school districts that removing the vestiges of a dual school system requires more than maintaining ratios in pupil assignments.

Consideration of the deficiencies in Denver's efforts to remove the barriers to participation by limited-English proficiency students demonstrates, again, the inter-relationship of each integral aspect of a truly unitary school system. To remedy the lack of bilingual teachers involves aspects of the affirmative action plan which has never been completed in this case, and may require alterations in the use of the seniority system. The placement of pupils into appropriate bilingual language programs may require changes in pupil assignments and transfers, which impact on the mix of students in individual schools. The use of "clustering" and magnet schools are approaches which may be productive, but which also impact on other aspects of the system. Perhaps the computer can be a very significant teaching tool for language remediation as suggested by the demonstration grant program which was discussed in the testimony at trial.

In sum, the issues which have been brought before the court by the plaintiff-intervenors are part and parcel of the mandate to establish a unitary school system. Accordingly, no discrete remedy for these issues will now be ordered, but the school district has the responsibility for implementing appropriate action as a part of compliance with the mandate to remove the effects of past segregative policies and to establish a unitary school system in Denver, Colorado.

In a memorandum opinion and order entered on May 12, 1982, accepting a "consensus" pupil assignment plan, I gave the following definition of a unitary school system:

A unitary school system is one in which all of the students have equal access to the opportunity for education, with the publicly provided educational resources distributed equitably, and with the expectation that all students can acquire a community defined level of knowledge and skills consistent with their individual efforts and abilities. It provides a chance to develop fully each individual's potentials, without being restricted by an

identification with any racial or ethnic groups.

*Keyes v. School District No. 1, Denver, Colorado,* 540 F.Supp. 399, 403–04 (D.Colo. 1982).

A failure to take appropriate action to remove language barriers to equal participation in educational programs is a failure to establish a unitary school system.

On December 16, 1982, an order was entered appointing three persons as the Compliance Assistance Panel and at a hearing held on January 4, 1983, it was established that the panel would attempt to work with the district on the ten matters identified in an earlier order to show cause as necessary steps toward developing a final order in this case. While this court has some awareness that there have been contacts by the panel members with the Board of Education and administrative staff of the district, there has been no formal submission to this court on any of those items.

It being apparent that the remedying of the failure to take appropriate action to remove language barriers is implicitly involved in many of these matters, it is this court's conclusion that a hearing should be set for the purpose of establishing procedures and timing for the defendant to make the required submissions for consideration through the formal procedures of the litigation process and that the development of remedies for the discrete issues discussed in this memorandum opinion will be considered as a part of the total process directed toward the entry of a final judgment establishing the parameters of federal law within which the district will be governed according to the educational policies established by those who are selected for that purpose. Accordingly, it is

ORDERED, that a hearing will be held on January 20, 1984 at 10:00 a.m. in Courtroom A, Second Floor, Post Office Building, 18th and Stout Streets (use 19th Street entrance), Denver, Colorado.